UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

In re:

Brazen Sky Limited                                    Chapter 15

     Debtor in a Foreign Proceeding.          Case No.: 22-16795

_____/

In re:

Aabar Investments PJS Limited                         Chapter 15

     Debtor in a Foreign Proceeding.          Case No.: 22-16802

_____/

In re:

Tanore Finance Corporation                            Chapter 15

     Debtor in a Foreign Proceeding.          Case No.:  22-16803

_____/

In re:

Blackstone Asia Real Estate Partners Limited          Chapter 15

     Debtor in a Foreign Proceeding.          Case No.: 22-16805

_____/

In re:

Vasco Investment Services SA                          Chapter 15

     Debtor in a Foreign Proceeding.          Case No.: 22-16808

_____/

In re:

Selune Limited                                        Chapter 15

     Debtor in a Foreign Proceeding.          Case No.:  22-16810

_____/

In re:

Pacific Rim Global Growth Limited     Chapter 15

   Debtor in a Foreign Proceeding.   Case No.: 22-16812

_____/

In re:

Affinity Equity International Partners Limited Chapter 15

   Debtor in a Foreign Proceeding.   Case No.: 22-16815

_____/

In re:

Bridge Global Absolute Return Fund SPC[1]  Chapter 15

   Debtor in a Foreign Proceeding.   Case No.:  22-16816

_____/

## MOTION FOR ORDER GRANTING RECOGNITION OF FOREIGN MAIN PROCEEDING PURSUANT TO §§ 1515 AND 1517 OF THE BANKRUPTCY CODE

Angela Barkhouse, Helen Janes, and Carl Jackson, the Joint Liquidators (the "JLs") of Brazen Sky Limited ("Brazen Sky"), Aabar Investments PJS Limited ("Aabar-BVI"), Tanore Finance Corporation ("Tanore"), Blackstone Asia Real Estate Partners Limited ("Blackstone"), Vasco Investment Services SA ("Vasco"), Selune Limited ("Selune"), Pacific Rim Global Growth Limited ("Pacific Rim") and Affinity Equity International Partners Limited ("Affinity") (collectively the "BVI Companies") and Angela Barkhouse and George Kimberley Leck (the "JOLs" and together with the JLs, the "Liquidators" or "Foreign Representatives"), the Joint

---

[1] Concurrent with this Motion, the Foreign Representatives filed a Motion seeking reassignment of these cases to the Honorable Robert A. Mark.  The Debtors formed part of the fraudulent scheme known as the 1MDB Fraud, which is under investigation by the Foreign Representatives in the Chapter 15 cases of SRC Strategic Resources Limited, Case No. 22-12654-RAM, Bright Oriande Limited, Case No. 22-12655-RAM, and SRC International (Malaysia) Limited, Case No. 22-12656-RAM, pending before Judge Mark.

2

Official Liquidators of Bridge Global Absolute Return Fund SPC ("Bridge Global Fund", and together with the BVI Companies, the "Debtors"),  file this *Motion for Order Granting Recognition of Foreign Main Proceeding Pursuant to §§ 1515 and 1517 of the Bankruptcy Code* (the "Motion").  The Motion seeks entry of an Order granting (i) recognition, pursuant to 11 U.S.C. § 1517[2], of the Debtors' liquidation proceedings (the "Debtors' Liquidations") pending in the British Virgin Islands (the "BVI") and the Cayman Islands; (ii) related relief pursuant to sections 1520 and 1521 of the Bankruptcy Code; and (iii) any other and further relief which may be available under the Bankruptcy Code.  In support of the Motion, the Foreign Representatives respectfully state as follows:

## PRELIMINARY STATEMENT

1.      The Foreign Representatives filed the Chapter 15 Petition for Recognition of a Foreign Proceeding (the "Petition") pursuant to section 1504 seeking recognition of the Debtor's Liquidation as a "foreign main proceeding" as defined in section 1502(4).  D.E. 1.

2.      The Declaration of Angela Barkhouse (the "Barkhouse Declaration"), addressing the requirements of § 1515(c) of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 1007(a)(4), is attached hereto as **Exhibit "A".**

3.      The Declaration of Andrew Emery (the "Emery Declaration"), regarding BVI law, is attached hereto as **Exhibit "B"**.

4.      The Declaration of Adam Crane (the "Crane Declaration"), regarding Cayman Islands law, is attached hereto as **Exhibit "C".**

5.      The qualifying resolutions passed by Brazen Sky's members and directors directing

---

[2]      Unless otherwise specified herein, all statutory references shall be to Title 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code").

its wind up and appointing the JLs as joint liquidators, the Orders of the BVI High Court of Justice (the "BVI Court") commencing the liquidations of Aabar-BVI, Tanore, Blackstone, Vasco, Selune, Pacific Rim, and Affinity and appointing the JLs as joint liquidators, and the Order of the Grand Court of Cayman (the "Cayman Court") placing Bridge Global Fund into liquidation and appointing the JOLs as joint official liquidators, are attached to the Barkhouse Declaration as **Composite Exhibit "1".**

6.      The Petition, this Motion, and the Declarations demonstrate that the Debtors' Liquidation should be recognized as a foreign main proceeding pursuant to section 1517 of the Bankruptcy Code.

7.      The Foreign Representatives seek the type of relief that Chapter 15 was designed to provide, and the Debtors' Liquidations, the Petitions, and this Motion meet all the requirements for recognition and the requested relief.

## <u>JURISDICTION AND VENUE</u>

8.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and sections 109 and 1501 of the Bankruptcy Code.

9.      This is a "core" proceeding pursuant to 28 U.S.C. § 157(b)(2)(P), and the Court may enter a final order consistent with Article III of the United States Constitution.

10.     The British Virgin Islands is the Debtor's center of main interests for the BVI Companies as each of their registered offices is located there. The Cayman Islands is the center of interest for Bridge Global Fund as its registered office is located there.

11.     Venue is proper in this district under 28 U.S.C. § 1410.   The Foreign Representatives have retained Sequor Law, P.A. ("Sequor Law") in this district and Sequor Law holds in its trust account in this district the sum of US$ 1,500.00 on behalf of and for the benefit

4

of each Debtor (totaling US$ 13,500.00) to which funds Sequor Law has no rights of setoff, charging lien, or similar right.

## BACKGROUND

### A.    The Debtors and their Purported Business

12.    The Debtors were part of the fraud perpetrated against 1 Malaysia Development Berhad ("1MDB"), a sovereign wealth fund owned by the Malaysian Ministry of Finance, in which numerous entities and individuals formed a network to divert and distribute funds to the fraudsters who orchestrated the fraud and to individuals and/or entities connected to them ("the Fraud").  **Ex. A** at ¶ 9.  An estimated total of US$ 8.5 billion was diverted and/or siphoned off from 1MDB and SRC International Sdn Bhd ("SRC Malaysia").  *Id.*

13.    Brazen Sky was incorporated in the BVI as a wholly owned subsidiary of 1MDB on July 12, 2012. *Id.* at ¶ 10. Its purported purpose was to pursue investment and development projects for the economic benefit of Malaysia and its people, primarily through the issuance of various debt securities to fund these projects. The Liquidators, based upon information received, believe Brazen Sky was the sole investor in six segregated portfolios ("Segregated Portfolios") of the Bridge Global Fund. *Id.* Brazen Sky was used as a conduit to divert and misappropriate funds as a part of the wider Fraud.

14.    Aabar-BVI was incorporated in the BVI on March 14, 2012, by two Emirati individuals, Khadem Abdulla Al Qubaisi ("Qubaisi") and Mohamed Ahmed Badawy Al-Husseiny ("Husseiny").  *Id.* at ¶ 11.  The JLs believe that Aabar-BVI was fraudulently presented as a subsidiary of Aabar Investments PJS ("Aabar-UAE") which Qubaisi and Husseiny used to divert assets from the wider Fraud.

15.     Vasco was incorporated in the BVI on October 27, 2010.  *Id.* at ¶ 12.  The JLs, based upon information received, believe the ultimate beneficial owner of Vasco is Qubaisi.  *Id.* The JLs believe that Qubaisi was a co-conspirator in the Fraud and used Vasco as a shell company through which to divert funds misappropriated from 1MDB.

16.     Tanore was incorporated in the BVI on October 19, 2012.  *Id.* at ¶ 13.  The JLs believe Tanore was a shell company with no legitimate business that acted as a conduit for funds flowing from 1MDB to other entities and individuals involved in the Fraud, including former Prime Minister of Malaysia, Mohb Najib bin Hj Abdul Razak ("Najib").  Its beneficial owner is Eric Tan Kim Loong ("Eric Tan"), a business partner of Malaysian financier Low Taek Jho ("Jho Low") and one of the key individuals involved in the Fraud.  *Id.*

17.     Blackstone was incorporated in the BVI on November 1, 2010, under a different name.  *Id.* at ¶ 14.  Its name may have been chosen to resemble a legitimate consortium of investment companies, the Blackstone Group, and a legitimate subsidiary of the Group, Blackstone Real Estate Partners Limited, which is incorporated in the United Kingdom. The JLs, based upon the Department of Justice ("DOJ") filings, believe it is beneficially owned by Eric Tan.  *Id.*  It was a key conduit for funds flowing in the Fraud from 1MDB to the individuals involved. It also received money defrauded from SRC Malaysia.

18.     Selune was incorporated in the BVI on August 19, 2010.  *Id.* at ¶ 15.  Based upon information in the public domain, and from DOJ filings, the JLs believe the ultimate beneficial owner of Selune is Jho Low.  *Id.*  The JLs, also believe Selune received funds from many bank accounts around the world and facilitated onward passage of those funds to additional accounts, many of which were maintained in connection with a specific asset purchase.

6

19.     Pacific Rim was incorporated in the BVI on April 16, 2009 under a different name. *Id.* at ¶ 16.  The purported purpose of Pacific Rim was as an investment fund.  However, the JLs, based upon the Department of Justice DOJ filings, believe it instead served as a conduit for the Fraud.  It received hundreds of millions of dollars from SRC International (Malaysia) Limited ("SRC-BVI"), a BVI-incorporated subsidiary of SRC Malaysia, and funneled these funds to other third parties.  *Id.*

20.     Affinity was incorporated in the BVI on July 3, 2012.  *Id.* at ¶ 17.  The JLs believed that Affinity was beneficially owned by Eric Tan and was established as a shell corporation to facilitate the transfer of funds between the fraudsters and their associates.  *Id.*

21.     Bridge Global Fund was incorporated under the laws of the Cayman Islands on August 8, 2012.  *Id.* at ¶ 18.  It was registered as a regulated mutual fund from November 15, 2013 but effective May 20, 2020, the Cayman Islands Monetary Authority cancelled the Company's mutual fund registration. The sole purpose of Bridge Global Fund appears to have been to hold segregated portfolios, of which there were 14.  The first six of these portfolios to be established were used to facilitate the Fraud ("the Segregated Portfolios").  The investment from Brazen Sky into the Bridge Global Fund is connected to the Fraud.

**B.**     **1MDB and Nature of the Schemes**

22.     The main force behind 1MDB's establishment was the then Prime Minister of Malaysia, Najib. Najib was Chairman of 1MDB from 2009 to 2016.  *Id.* at ¶ 19.  He additionally served as Minister of Finance and indirectly controlled 1MDB.  Najib was sentenced to 12 years in prison in Malaysia in 2020 for corruption, money laundering, and abuse of power. He will stand trial for additional charges related to 1MDB.  A second key perpetrator of the Fraud is Jho Low,

7

who exercised significant control over 1MDB without any formal role. *Id.* at ¶ 20. Criminal proceedings are ongoing against Jho Low in the U.S. and Malaysia, of which he is a fugitive.

23.     The DOJ investigation identified four main stages to the Fraud, known as the "Good Star", "Aabar-BVI", "Tanore" and "Options Buyback" phase. *Id.* at ¶ 21. The Debtors are involved in one or more of these phases. There is also evidence of the Debtors' involvement in the fraudulent diversion of loans made to SRC Malaysia.

### a.    <u>Links to the "Good Star" Phase of the Fraud</u>

24.     The "Good Star" phase of the fraud relates to a fraudulent joint venture between 1MDB and Petro Saudi Holdings (Cayman) Ltd ("PetroSaudi Cayman"), a subsidiary of PetroSaudi International ("PetroSaudi UAE"). In summary, in 2009, 1MDB agreed to invest US$ 1,000,000,000 in cash for a 40% equity stake in a joint venture company (the "JV") with a Cayman Islands subsidiary of PetroSaudi International ("PetroSaudi Cayman"), in exchange for PetroSaudi Cayman transferring energy assets to the JV. *Id.* at ¶ 24. 1MDB only partially complied with the purported agreement as it only transferred US$ 300,000,000 to the JV's bank account. However, the remaining US$ 700,000,000 was diverted by 1MDB to the account of Good Star Limited ("Good Star"). Good Star is a Seychelles company, believed to be owned by Jho Low, that facilitated the Fraud. In fact, more than US$ 1,000,000,000 was diverted through Good Star, and these transferred involved many of the Debtors. Accordingly, the JLs believe Good Star is another company set up to receive fraudulent funds for onward distribution to Jho Low and his associates. *Id.*

*Brazen Sky Involvement*

25.     To cover up the misappropriation of funds to Good Star, the investment in 1MDB PetroSaudi was restructured several times, involving a fraudulent valuation of the underlying

assets of the JV. 1MBD sold back its original US$ 1 billion equity investment to 1MDB Petro Saudi in the form of debt notes and then agreed to provide 1MDB Petro Saudi with a US$ 1.5 billion loan. *Id.* at ¶ 23. Of these funds, from May to October 2011, a US$ 330,000,000 was diverted from 1MDB to a Swiss bank account held in the name of Good Star ("Good Star Account"). *Id.* In June 2012, 1MDB restructured its investment again and exchanged the US$ 1,200,000,000 debt notes for a 49% shareholding in PetroSaudi Oil Services Limited ("PSOSL") with a call option to acquire the remaining 51% shareholding in PSOSL. *Id.* PSOSL was a wholly-owned subsidiary of PetroSaudi (UAE) which became embroiled in the Fraud. PSOSL reportedly held net assets of only US$ 93,600,000 in 2012. However, 1MDB purported its investment in PSOSL was worth some US$ 2,200,000,000. *Id.* 1MDB initially held its stake in PSOSL through 1MDB International Holdings Limited ("1MIHL"), a BVI incorporated company.

26.     In September 2012, 1MDB further restructured its investment by causing 1MIHL to sell its equity stake in PSOSL to Bridge Partners International for consideration of US$ 2,318,000,000, by way of the Promissory Notes. *Id.* at ¶ 24. 1MHL used the proceeds of the sale to subscribe for shares in Brazen Sky and authorized Brazen Sky to further reinvest the proceeds by subscribing for funds units in the Bridge Global Fund. *Id.* Through this series of restructures, the diversion of US$ 1,030,000,000 to Good Star had been concealed and 1MDB could claim that its investment, now held by Brazen Sky, was worth US$ 2,200,000,000.

27.     Accordingly, Brazen Sky was the beneficial owner of the investments in Bridge Global Fund and the Segregated Portfolios. *Id.* at ¶ 25. Brazen Sky is also a contingent or prospective creditor of Bridge Global Fund within the meaning of section 94(1)(b) of the Cayman Companies Act 2022. The documents and information the Liquidators have reviewed suggest that Brazen Sky most likely redeemed its investment in Bridge Global Fund in February 2015.

9

28.     Due to the nature of the Fraud, Brazen Sky does not possess full or accurate copies of documents related to Brazen Sky's investment/subscription for shares of the company and the Segregated Portfolio. *Id.* at ¶ 26. The Liquidators have made several attempts to obtain copies of documents relating to Brazen Sky's investment into the company/Segregated Portfolios from the voluntary liquidators of BSI Bank but are yet to receive this. *Id.*

29.     1MDB subsequently used the purported value of the investments held by Brazen Sky to secure loans of US$ 975,000,000 which were diverted to companies and individuals involved in the Fraud. *Id.* at ¶ 27.

*Bridge Global Fund Investment*

30.     On September 12, 2012, Brazen Sky subscribed for shares in the Bridge Global Fund (also referred to as the "Fund"), using assigned promissory notes. *Id.* at ¶ 28.  It is believed that the only asset the Bridge Global Fund held during the relevant period was the 49% shareholding of PSOSL, linking the value of both companies. *Id.* at ¶ 29.  1MDB wanted PSOSL valued at US$ 2.4 billion so it could claim its investment was profitable. *Id.*  In and around August 2013, a Singapore based equity research firm eventually agreed to provide this valuation for a fee of US$ 300,000, which was paid by Affinity. *Id.*

31.     In September 2013, Brazen Sky received dividends totaling US$ 198,774,140 from the Bridge Global Fund. *Id.* at ¶ 30.  It is unclear how these payments were generated, due to the loss-making assets underlying the Bridge Global Fund. *Id.* The evidence that the JOL's reviewed suggests these payments were 1MDB funds diverted through Affinity to give the appearance that the Fund was profitable. The JOL's believe that Brazen Sky's holding in PSOSL may have been transferred to a Curacao-based fund called Avalon Global Opportunity Fund B.V. ("Avalon"). The JOL's are conducting further investigations to determine if this is the case. *Id.* at ¶ 31.

SEQUOR LAW, P.A.

*Selune Involvement*

32.     An account in the name of Selune ("Selune Account") was maintained at Rothschild Bank AG in Switzerland and Jho Low represented that he was the beneficial owner of Selune and the Selune Account. *Id.* at ¶ 32.  Selune received and diverted funds during the Fraud, receiving approximately US$ 140,000,000 and transferring on approximately US$ 112,000,000. *Id.*

33.     Funds diverted through Selune were used to purchase assets such as two New York properties: the Time Warner Penthouse and Time Warner Storage Unit for a consideration of US$ 30,550,000. *Id.* at ¶ 33.  The occupant of the property was identified as Low Hock Peng ("Larry Low"), Jho Low's father. Funds for the purchase can be traced from 1MDB to the Good Star Account, then to an account controlled by Jho Low and finally to an account held by Larry Low. *Id.* at ¶ 34.  Larry Low also transferred funds from this account to the Selune Account.  *Id.*  On March 19, 2020, the US District Court for Central California entered an amended consent judgment of forfeiture for these two properties.  *Id.*

34.     Jho Low acquired two properties located in Mayfair, London with funds ultimately traceable to a transfer from 1MDB to the Good Star Account; a penthouse apartment in Stratton House and another flat a few doors down from the Penthouse.  *Id.* at ¶ 35.  On November 3, 2019, the US District Court for Central California entered an amended consent judgment of forfeiture for these two properties.

*Vasco Involvement*

35.     On February 20, 2013, funds were wired to an account held in the name of Vasco at Bank Privée Edmond de Rothschild in Luxembourg ("Vasco Account") from the Good Star Account.  *Id.* at ¶ 36.

SEQUOR LAW, P.A.

**b.**  **Links to the "Aabar-BVI" Phase of the Fraud**

36.    The "Aabar-BVI" phase involved the misappropriation of the proceeds of bond issues arranged and underwritten by Goldman Sachs ("Goldman"). *Id.* at ¶ 37.  The JLs believe that approximately US$ 1.3 billion was diverted from 1MDB during this phase of the Fraud. There were two tranches of bond issues: Project Magnolia, which comprised US$ 1,750,000,000 issued by 1MDB subsidiary 1MDB Energy Limited ("1MDB Energy") in May 2012 and Project Maximus, US$ 1,750,000,000 issued by 1MDB Energy (Langat) Limited ("1MELL") in October 2012. *Id.*  These bond issues were nominally intended to finance 1MDB's acquisition of energy and natural resources assets. Instead, a substantial proportion of the proceeds were channeled through Aabar-BVI to Blackstone.

*Aabar-BVI Involvement*

37.    The JLs believe the name of Aabar-BVI was chosen to suggest that Aabar-BVI was a legitimate subsidiary of Aabar-UAE or International Petroleum Investment Company ("IPIC"), an investment fund wholly owned by the government of Abu Dhabi, United Arab Emirates ("UAE").  However, IPIC and Aabar-UAE issued a statement to the London Stock Exchange that Aabar-BVI was not an entity within either corporate group.  *Id.* at ¶ 38.

38.    Qubaisi and Husseiny opened an account in the name of Aabar-BVI ("Aabar-BVI Account").  *Id.* at ¶ 39.  The JLs believe that they falsely represented to BSI Bank that Aabar-UAE was the beneficial owner of the Aabar-BVI Account.  Both 1MDB Energy and 1MELL held bank accounts at Falcon Bank (respectively, "1MDB Energy Account" and "1MELL Account").  *Id.* Both projects offering circulars represented that a portion of the proceeds would be used to acquire power assets and the remainder were designated for general commercial purposes. *Id.* at ¶ 40.

SEQUOR LAW, P.A.

39.     On May 21, 2021, the closing date for the Project Magnolia bonds, proceeds were transferred to the 1MDB Energy Account. *Id.* at ¶ 41.  On the next day, one third of the net proceeds of the bond sale were wired from this account to the Aabar-BVI account. Similarly, On October 19, 2012, the closing date for the Project Maximus bonds, 1MDB directed that the net proceeds of the sale be wired to the 1MELL Account.  *Id.*  A portion of the proceeds were wired out of the 1MELL Account in connection to the power asset purchases.  On the same day, 1MDB wire transferred what constituted half of the proceeds to the Aabar-BVI Account.  Neither the Project Magnolia nor the Project Maximus offering circulars represented that any portion of the capital raised would be diverted to Aabar-BVI, let alone approximately 40% of the net proceeds of the two bond sales.  *Id.* at ¶ 42.

40.     The subsequent activity of the Aabar-BVI Account was inconsistent with the purported operation of a legitimate subsidiary of Aabar-UAE or IPIC.  *Id.* at ¶ 43.  The JLs believe that the Aabar-BVI Account was used to conceal and facilitate the fraudulent diversion of funds to subsidiary shell companies and was used to collect and distribute the proceeds of fraud to officials at IPIC, Aabar, and 1MDB.  *Id.*

41.     From June to November 2012, US$ 238,000,000 was transferred from the Aabar-BVI Account to an account held in the name of Red Granite Capital Limited (BVI) ("Red Granite Capital").  *Id.* at ¶ 44.  Red Granite Capital was a BVI-incorporated company owned and controlled by Riza Shahriz Bin Abdul Aziz ("Aziz"), Najib's stepson.

42.     Aziz used the misappropriated funds to acquire (1) real estate interests in New York City, Beverly Hills, and London, (2) Red Granite Pictures, a motion picture company, (3) artwork, and (4) to fund gambling expenses at a Las Vegas Casino for Aziz, Low, and Eric Tan. *Id.* at ¶ 45.

SEQUOR LAW, P.A.

43. Based upon the foregoing, the JLs believe that Aabar-BVI was used to collect and distribute the proceeds to officials at IPIC, Aabar-UAE, and 1MDB. *Id.* at ¶ 46. The JLs further believe that the Aabar-BVI Account was used to conceal and facilitate the fraudulent diversion of funds to subsidiary shell companies.

*Blackstone Involvement*

44. Blackstone received and diverted funds from the "Aabar-BVI" phase of the Fraud totaling approximately US$1.1 billion. *Id.* at ¶ 47. Between May and December 2012, a total of approximately US$ 637,000,000 was sent from Aabar-BVI Account to an account held in the name of Blackstone ("Blackstone Account"). *Id.* at ¶ 48. Eric Tan was the beneficial owner of the Blackstone Account. Additionally, Curacao-incorporated investment funds, Cistenique Investment Fund ("Cistenique") and Enterprise Emerging Markets Fund ("Enterprise"), were used to channel US$ 464,285,000 of funds from Aabar-BVI to Blackstone. *Id.*

45. The Blackstone Account was emptied shortly after it received funds from Aabar-BVI. *Id.* at ¶ 49. The funds Blackstone received from Aabar-BVI were distributed to the Vasco Account, two accounts controlled by Husseiny, an account controlled by Najib, and an account held by a high level 1MDB executive. *Id.*

*Vasco Involvement*

46. Vasco was used as a conduit for fraud during the 'Aabar-BVI phase'. The JLs believe that Qubaisi used Vasco as a shell company through which to divert funds misappropriated from 1MDB. Qubaisi used a proportion of those funds to purchase assets. *Id.* at ¶ 50. The ultimate destination of the remaining funds is not known. The JLs believe Vasco received and diverted funds from the "Aabar-BVI" phase of the Fraud totaling at least US$ 493,500,000[3].

---

[3] This figure comprises the Blackstone funds and $20.75 million from Good Star.

SEQUOR LAW, P.A.

47.     Based on DOJ filings, between approximately May 2012 and November 2012, about US$ 472,750,000 were sent from the Blackstone Account to the Vasco Account.  *Id.* at ¶ 51. Each transfer was executed within days after the Blackstone Account received funds from Aabar-BVI.  These transactions are consistent with the JLs' belief that Aabar-BVI, Blackstone, and Vasco had no legitimate business activity and were used as shell companies to divert funds for the personal benefit of the fraudsters.

48.     Qubaisi and associates, including Jho Low, used the funds diverted to the Vasco Account to purchase or attempted to purchase, luxury goods including real property in Manhattan and Beverly Hills, an aircraft, and a yacht.  *Id.* at ¶ 52.  These assets demonstrate that Qubaisi and associated parties used the Vasco Account to deposit and disperse misappropriated funds.  *Id.*  The known confiscated assets account for US$ 98,000,000 of the approximately US$ 472,500,000 diverted to Vasco.  The ultimate whereabouts of the remaining funds are not known.

49.     The JLs believe Qubaisi purchased a penthouse in Walker Tower, a condominium complex in New York City using funds misappropriated from 1MDB. *Id.* at ¶ 53.  Qubaisi also purchased the Laurel Beverly Hills Mansion using funds misappropriated from 1MDB.  *Id.*  On May 6, 2020, the US District Court for the Central District of California entered a consent judgment of forfeiture for the Walker Tower Penthouse and the proceeds of the sale of the Laurel Beverly Hills Mansion.  *Id.*

50.     Between March 2013 and September 2015, Qubaisi transferred funds totaling over US$ 15,000,000 held in the Vasco Account to further entities which he controlled and beneficially owned.  *Id.* at ¶ 54.  He then used these funds to purchase a Gulfstream jet on December 31, 2013, through a company he beneficially owned, Lifford Finance S.A. ("Lifford").

SEQUOR LAW, P.A.

51.    In August 2015, Qubaisi sold the Gulfstream jet for approximately US$ 65,600,000. On August 10, 2015, the sale proceeds were transferred to an account held in Lifford's name ("Lifford Account"). *Id.* at ¶ 55.    On or around August 28, 2015, Qubaisi transferred approximately US$ 65,000,000 from the Lifford Account to another account he controlled and then transferred this sum to the Vasco Account. On or around September 2015, Qubaisi transferred approximately US$ 65,000,000 from the Vasco account to another account in the name of Eagle Strategic Investment Fund (B) ("Eagle Strategic Account"). *Id.* At the date of the US DOJ filing, the Eagle Strategic Account had a balance of approximately US$ 27,200,000. Information in the US DOJ filing shows approximately US$ 47,000,000 remains deposited in the Vasco and Eagle Strategic accounts. *Id.* at ¶ 56.

52.    In August 2012, Oceanus Maritime assumed ownership and possession of the yacht The A+ (formerly known as M/Y Topaz) based upon a 2008 contract for approximately US$ 688,000,000. *Id.* at ¶ 57. Oceanus Maritime funded the purchase through a EUR 400,000,000 loan extended by Deutsche Bank. Upon the US DOJ filings, the JLs believe that misappropriated funds totaling US$ 160,930,752 were used to pay back this loan and thus obtain partial ownership of the A+. *Id.* at ¶ 58. The JLs believe funds passed from the Vasco Account through another account and then to an account held by Oceanus Maritime.

*Affinity Involvement*

53.    Affinity was beneficially owned by Eric Tan and appears to have been established as a shell corporation too and was used to receive, and distribute, funds from the Fraud. On September 10, 2013, Affinity received US$ 25,500,000 from Aabar-BVI. *Id.* at ¶ 59. This was subsequently distributed by Affinity, in large part to Red Granite Investment Holdings LLC, a company owned by Aziz, which received US$ 11,500,000 and to Eric Tan's companies Blackrock

Commodities (Global) Limited ("Blackrock") and, Platinum Global Luxury Services Limited ("Platinum Global"), which together were paid US$ 6,250,000.

*Selune Involvement*

54.    Jho Low used a portion of the funds derived from the "Aabar-BVI" phase to purchase two artworks. *Id.* at ¶ 60. US$ 110,000,000 was transferred from Jho Low's BSI Bank account to Selune and paid on to 'One Universe' accounts believed by the JLs to be controlled by Jho Low and his associates. *Id.* Jho Low purchased Campbell's Soup Can painting, by Andy Warhol for US$ 6,000,000 and Vetheuil au Soleil painting, by Claude Monet for US$ 9,700,000, using these funds.

55.    The ultimate whereabouts of the funds believed to be left in the Selune Account following the transfers to various entities is unknown. *Id.* at ¶ 61. The ultimate whereabouts of the funds remaining in the One Universe Art Trust Account is unknown. The remaining funds diverted to Selune during this phase remain unaccounted for. The JLs seek to trace and recover these funds.

### c.    Links to the "Options Buyback" Phase of the Fraud

56.    In 2014, 1MDB approached Deutsche Bank to secure funding for a fraudulent scheme to purportedly acquire options granted to IPIC for guaranteeing the Project Magnolia and Project Maximus bonds. *Id.* at ¶ 62. On May 26, 2014, Deutsche Bank agreed a bridge loan facility of US$ 250,000,000 to 1MDB's subsidiary, 1MDB Energy Holdings Limited ("1MEHL") ("Deutsche Bank Bridge Loan") for this purpose. This formed the first tranche of funds obtained from Deutsche Bank in what the DOJ classify as the "Options Buyback" phase.

SEQUOR LAW, P.A.

57.     On May 28, 2014, US$ 239,940,000 in proceeds from the Deutsche Bank Bridge Loan were transferred into a bank account held in the name of 1MEHL at Falcon Bank ("1MEHL Account").  *Id.* at ¶ 63.

*Brazen Sky and Bridge Global Fund Involvement*

58.     Some of the second loan proceeds were circulated in an elaborate series of transactions intended to create the false appearance that Brazen Sky was 'redeeming' its investments in the Segregated Portfolios.  *Id.* at ¶ 71.  Throughout 2014, Brazen Sky received seven incoming cash transfers from the Bridge Global Fund, which were allegedly the proceeds of the sale of the Bridge Global Fund units.  *Id.* These funds were in fact money which 1MDB had borrowed from Deutsche Bank, diverted to Aabar-Seychelles and cycled several times through a series of overseas bank accounts, including Bridge Global and Brazen Sky, before being returned to Aabar-Seychelles.

*Aabar-BVI Involvement*

59.     US$ 175,000,000 was transferred from the 1MEHL Account to the Aabar-BVI Account.  *Id.* at ¶ 64.  On May 30, 2014, US$ 155,000,000 was transferred from the Aabar-BVI Account to an account held in the name of Affinity Equity at DBS Bank Limited in Singapore ("Affinity Account").

*Affinity Involvement*

60.     Of the funds transferred from Aabar-BVI, US$ 142,000,000 was transferred from the Affinity Account to an account held in the name of Alpha Synergy Limited ("Alpha Synergy"), a company beneficially owned by Jho Low.  *Id.* at ¶ 65.  On June 3, 2014, Jho Low transferred these funds to his personal bank account and then expended almost the full amount to acquire a 300-foot luxury yacht, called the Equanimity.  *Id.*  It was subsequently confiscated by the DOJ.

18

61.     On June 18, 2014, Aabar-BVI paid a further US$ 19,000,000 of the Deutsche Bank Bridge Loan proceeds to Affinity. *Id.* at ¶ 66.  Different portions of the funds were then transferred to Eric Tan and his companies, Alpha Synergy, and an entity called Aabar Investments PJS Limited, incorporated in the Seychelles ("Aabar-Seychelles").  *Id.*

62.     In September 2014, loan proceeds were also diverted to the bank account of Aabar-Seychelles, which were then diverted to Affinity. *Id.* at ¶ 67.  The funds were further paid out to Eric Tan and his companies Blackrock, Platinum Global and TKIL Global Investments Limited ("TKIL Global"); Alpha Synergy Limited, a company controlled by Jho Low; and Tasameem, a company controlled by Qubaisi.

63.     The JLs have been able to obtain bank statements from DBS Bank Limited for the Affinity Account for the period August 2013 to October 2014. *Id.* at ¶ 68.  Numerous payments out of the Affinity Account have been identified that require further investigation. Payments to seventeen different recipients amount to US$ 258,218,816.  The recipients appear to be individuals and also companies incorporated in the BVI, Hong Kong and USA.

### d.    Links to the "Tanore" Phase of the Fraud

64.     The "Tanore" phase involved the misappropriation of the proceeds of a further bond issue arranged and underwritten by Goldman.  *Id.* at ¶ 72.  Once again, the proceeds were misappropriated and fraudulently diverted to bank accounts in Switzerland and Singapore.

65.     On March 12, 2013, 1MDB formed a joint venture with Aabar-UAE named Abu Dhabi Malaysia Investment Company ("ADMIC").  *Id.* at ¶ 73.  The intended purpose of ADMIC was to finance strategic development initiatives in both Malaysia and Abu Dhabi. Goldman was retained to assist in raising capital for ADMIC via a further bond sale, known as "Project

SEQUOR LAW, P.A.

Catalyze". *Id.* The bonds were issued by 1MDB Global Investments Limited ("1MGIL"), a wholly-owned subsidiary of 1MDB incorporated in the BVI.

66.     On March 19, 2013, the closing date for the Project Catalyze bond sale, the account held in the name of 1MGIL at BSI Lugano ("1MGIL Account") received the proceeds of the sale. *Id.* at ¶ 74. The JLs believe that approximately US$ 1,260,000,000 from the funds was diverted to overseas accounts controlled by Eric Tan and held in the name of various entities, as set out below.

*Tanore Involvement*

67.     In May 2013, 1MGIL transferred over US$ 1.5 billion from the 1MGIL Account to accounts belonging to Cistenique and Enterprise, and Devonshire Capital Growth Fund ("Devonshire"), an investment fund located in the BVI (the "Overseas Funds"). *Id.* at ¶ 75. Enterprise and Cistenique were used to divert funds traceable to the Project Maximus bond proceeds during the Aabar-BVI phase.

68.     On November 2, 2012, Eric Tan opened an account in the name of Tanore at Falcon Bank ("Tanore Account"). *Id.* at ¶ 76. On March 21 and 22, 2013, the Overseas Funds transferred funds to the Tanore Account. Additionally, on March 21, 2013, the Devonshire account transferred further funds to an account controlled by Eric Tan ("Granton Account") which were then transferred to the Tanore Account on that same day. *Id.* A few days later, Tanore transferred a portion back to the Granton Account.

69.     On March 21, 2013, US$ 681,000,000 were transferred from the Tanore Account to an account owned by Najib. *Id.* at ¶ 77. On August 26, 2013, US$ 620,010,715 was transferred back from a different account which was also owned by Najib to the Tanore Account. *Id.* The Liquidators believe that the movement of funds between accounts belonging to different legal

SEQUOR LAW, P.A.

entities which had the same beneficial owner served no commercial purpose. *Id.* at ¶ 78. The transactions were 'layered' to obscure the ultimate beneficial ownership of the funds.

70.     Eric Tan opened an account at Christie's Art Auction House, New York in early May 2013 in the name of Tanore. *Id.* at ¶ 79. At a series of auctions, Tanore purchased works, including but not limited to: (1) An unnamed work by Mark Ryden for US$ 714,000 on May 13, 2013; (2) an unnamed work by Ed Ruscha for US$ 367,500 on May 13, 2013; (3) *Dustheads* by Jean-Michel Basquiat for US$ 48,843,750 on May 15, 2013; (4) Untitled – Standing Mobile by Alexander Calder for US$ 5,387,750 on May 15, 2013 and; (5) *Tic Tac Toe* by Alexander Calder for US$ 3,035,750. *Id.*

71.     On June 4, 2013, funds were wire transferred from the Tanore Account at Falcon Bank to an account maintained by Christie's ("Christie's Account"). *Id.* at ¶ 80. On June 28, 2013, Tanore acquired two further works of art at a private auction organized by Christie's: *Concetto spaziale, Attese*, by Lucio Fontana; and Untitled (Yellow and Blue) by Mark Rothko. On July 3, 2013, and September 9, 2013, funds were wired from the Tanore Account to the Christie's Account totaling the amount the two artworks cost.

72.     These artworks were subsequently given to Jho Low, allegedly as gifts. *Id.* at ¶ 81. The JLs believe that, given Eric Tan gave artworks cumulatively worth in excess of US$ 100,000,000 to Jho Low, Eric Tan was acting as Jho Low's nominee when purchasing art through the Tanore Account, to obscure the ultimate beneficial ownership of the funds. *Id.*

73.     Based upon the foregoing, the JLs believe that Tanore was used to collect and distribute the proceeds of the Project Catalyze bond proceeds to Eric Tan, Jho Low, and affiliated parties. *Id.* at ¶ 82.

SEQUOR LAW, P.A.

*Pacific Rim Involvement*

74.    According to the DOJ investigation, Pacific Rim was one of several overseas funds which was specifically marketed to 1MDB management as a confidential means of transmitting funds to a designated third party. *Id.* at ¶ 83.  The funds received by Pacific Rim derived from two separate elements of the Fraud: (1) the fraudulent diversion of loans made to SRC Malaysia for the purpose of foreign investment; and (2) the laundering of 1MDB funds arising from other phases of the Fraud, particularly the 'Tanore phase'. *Id.* at ¶ 84.  The JLs believe these funds were mixed in the BSI Bank account held by SRC-BVI, a subsidiary of SRC Malaysia prior to being transferred to Pacific Rim.

75.    On September 5 and 6, 2013, the SRC-BVI BSI Account received funds from Cistenique and Enterprise.  *Id.* at ¶ 85.  After, two wires were sent from the SRC-BVI BSI Account to Pacific Rim. The JLs believe that these funds received by SRC-BVI from Cistenique and Enterprise were partially derived from the KWAP loan facility and partially from 1MDB funds, which were misappropriated during the "Tanore" phase.  *Id.*

**e.  Links to SRC-Malaysia Fraud**

76.    SRC Malaysia's planned investments in energy and natural resources assets were capitalized through loan facilities advanced by the Kumpalan Wang Persaraan (Diperbadankan) ("KWAP"), a statutory body which manages the pension fund for public employees in Malaysia. SRC-BVI, a subsidiary of SRC Malaysia received US$ 835,000,000 of the KWAP loans.  *Id.* at ¶ 86.  These funds were due to be invested in energy and natural resources assets.  However, these funds were never used for their intended, authorized purpose and instead were distributed from the SRC-BVI BSI Account to the Overseas Funds.

22

77.     It can be ascertained that approximately US$ 342,346,940 of the proposed investment funds were distributed from the SRC-BVI BSI Account to Cistenique, and approximately US$ 481,020,411 was distributed to Enterprise. *Id.* at ¶ 87.   In total, US$ 823,367,351 of the US$ 835,000,000 KWAP funds was paid to Cistenique and Enterprise.

*Blackstone Involvement*

78.     The funds received by Blackstone derived from the laundering of 1MDB funds arising from the "Aabar-BVI" phase of the Fraud and also the fraudulent diversion of loans made to SRC Malaysia for the purpose of foreign investment.  *Id.* at ¶ 88.  Based on the bank records of Cistenique and Enterprise, shortly after funds were received from SRC-BVI, similar amounts were transferred to Blackstone, for a total of US$ 506,900,000.  Based on existing transaction patterns, the Liquidators believe that Cistenique paid another portion of funds to Blackstone. If so, this would mean the total funds from SRC-BVI paid to Blackstone via Cistenique and Enterprise is US$ 806,900,000. *Id.* at ¶ 89.  It is not known how the SRC-BVI funds received by Blackstone were subsequently utilised, the whereabouts of these funds are unknown.

*Pacific Rim and Affinity Involvement*

79.     On September 10, 2013, Pacific Rim paid out funds to the Affinity account.  *Id.* at ¶ 90.  As set out above, these funds had previously passed through the SRC-BVI BSI Account and comprised funds from the "Tanore" phase and also funds from SRC Malaysia.

80.     On the same day, two payments totaling US$198,774,140 were made by Affinity to Vistra Asia Limited for the benefit of the Bridge Global Fund.  *Id.* at ¶ 91.  Vistra Asia Limited was the fund administrators for the Bridge Global Fund.  The Liquidators have traced these funds into the bank account of Brazen Sky, where they appear purportedly as dividends from the Bridge Global Fund.  The Liquidators maintain that these funds were diverted from 1MDB and SRC funds

23

through the network of companies to give the false, impression that the Bridge Global Fund was profitable.  *Id.*

81.    On December 24, 2013, Affinity received funds from Pacific Rim. *Id.* at ¶ 92. These funds were distributed on two days later, mostly to companies controlled by Eric Tan, including Blackrock, Platinum Global and TKIL, which between them received US$ 10,480,000. *Id.*

82.    Based upon the JLs' review of the SRC-BVI BSI Account and the Affinity Account, there is a discrepancy of US$ 4,912,739 between the funds received by Pacific Rim and transferred to the Affinity Account. *Id.* at ¶ 93.  The whereabouts of these funds are unknown.

**C.    Lead Up to the Debtors' Liquidation**

83.    In 2013 and 2014, the media covered activities of 1MDB, including its connection with SRC Malaysia and SRC-BVI.  *Id.* at ¶ 94.  In 2015, the international press began reporting that 1MDB and SRC Malaysia were under international investigation due to allegations of fraud and money laundering.  *Id.*  Until 2016, most investigation attempts in Malaysia were thwarted by the Malaysian government, as the Prime Minister of Malaysia, Najib, established 1MDB with Jho Low.

84.    In 2018, Najib was removed as Prime Minister and Malaysian authorities began to investigate the Fraud.  *Id.* at ¶ 95.  Najib and other co-conspirators were subject to criminal and civil proceedings related to the misappropriation of 1MDB funds in Malaysia and abroad. Malaysian authorities sought cooperation from global law enforcement, including the DOJ, which actively investigated and seized various assets in relation to the Fraud from 2016 onwards.  *Id.*

85.    Civil proceedings have been brought by the Liquidators and companies related to the Debtors in the BVI, Cayman Islands, Curacao, Barbados, USA, Hong Kong, Singapore and

Switzerland to recover assets and claim damages. *Id.* at ¶ 96. While the general details of the Fraud have been widely reported on, the full extent of the Fraud is unknown. The liquidation of the Debtors forms part of an international effort to trace and recover funds misappropriated through 1MDB. *Id.*

**D.** **The Debtors' Liquidations**

86.     Brazen Sky, Aabar-BVI, Tanore, Blackstone, Vasco, Selune, Pacific Rim, and Affinity were placed into liquidation pursuant to the BVI Insolvency Act 2003. **Ex. A** at ¶ 97 & **Comp. Ex. 1**. The JLs were appointed as joint liquidators pursuant to resolutions by members and directors (in the case of Brazen Sky) or by order of the BVI Court (in the case of the other BVI Companies). The Cayman Court placed Bridge Global Fund into liquidation and appointed the JOLs over Bridge Global Fund pursuant to sections 92(d) and 92 (e) of the Cayman Companies Act 2022. **Ex. A** at ¶ 98 & **Comp. Ex. 1**. The Debtors' Liquidations are part of asset recovery efforts for the benefit of the Debtors' creditors.

87.     The JLs provided notice by publication of the BVI Companies liquidations and their appointment and invited creditors to submit claims in the BVI liquidation. **Ex. A** at ¶ 99 & **Comp. Ex. 1**. The JLs published a notice in the BVI Government Gazette and the BVI Beacon newspaper, save in the case of Selune, Aabar-BVI, Tanore and Blackstone, as the BVI Court of Justice dispensed with the requirement for these companies to be advertised, pursuant to section 165 of the Insolvency Act. *Id.* The JLs also made filings with the BVI Registrar of Companies and served on the company's registered agents, other than when the court dispensed with such requirements. To the best of the JLs' knowledge and belief, this is the most appropriate jurisdiction to notify to ensure that the knowledge of the BVI Companies' liquidations reaches all potential creditors of the Debtors. *Id.*

SEQUOR LAW, P.A.

88.     Pursuant to the requirements of the Cayman Companies Act, in connection to the liquidation of the Bridge Global Fund, the JOLs published a notice in the Cayman Islands Gazette on May 11, 2022, giving notice of their appointment, convened a meeting of creditors on May 27, 2022, and invited creditors to submit their claims for consideration in the liquidation.  **Ex. A** at ¶ 103 & **Comp. Ex. 1**.

89.     Since their appointment, the Liquidators have been conducting Bridge Global Fund's activities out of (or primarily out of) the Cayman Islands and the activities of all the BVI Companies out of Cayman and BVI.  **Ex. A** at ¶ 104 & **Comp. Ex. 1**.

90.     Upon their appointment, the Liquidators have also managed the affairs, business, and property of the Debtors in order to achieve an orderly wind-down and facilitate the recovery of assets for the benefit of creditors.  **Ex. A** at ¶ 105 & **Comp. Ex. 1**.  Actions that the Liquidators may take or are taking include but are not limited to: (i) continuing business as usual for trading operations (but, for the avoidance of doubt, not the origination of new business), obligor receipts, and payments of the BVI Companies or Bridge Global Fund as principal, where appropriate arrangements are put in place; (ii) agreeing and finalizing the form of support with investors to recover costs incurred in connection with the Debtors continuing efforts to assist with recovery of assets; (iii) dealing with any defaulting obligors and taking steps to protect the position of the Debtors or investors; (iv) continuing assistance with subsidiaries to wind up or facilitate a sales process, as applicable, and realize value where possible; (v) continuing to liaise with agents regarding the disposal of remaining assets; (vi) paying liquidation expenses; (vii) agreeing on the claims of the unsecured and preferential creditors and payment of a dividend, if future realizations make this feasible; (viii) paying distributions to the secured creditors of the Debtors; (ix) finalizing the Debtors' tax affairs, including completion of corporation tax and VAT returns and settlement

of any post liquidation liabilities, where relevant; and (x) complying with statutory and regulatory obligations, including investigations.

91.     Since their appointment, the Liquidators have taken a number of steps to identify, secure and take into their possession and control the assets and records of the Debtors. The Liquidators have identified various individuals and entities located in the United States who either participated or otherwise possess knowledge relating to the above transactions. The Liquidators also believe that part of the Debtors' missing funds are located in the United States as some of the missing funds passed through US entities. Accordingly, the Liquidators file this Chapter 15 to (i) obtain information from these third parties and continue their investigations on the loss and misappropriation of the Debtors' funds, and (ii) to the extent they localize any assets, take control and liquidate the same for the benefit of the Debtors' estates.

## RELIEF REQUESTED

92.     By this Motion, the Liquidators respectfully request an Order pursuant to sections 105(a), 1507, 1517, 1520 and 1521 of the Bankruptcy Code, substantially in the form of the Proposed Order, attached hereto as **Exhibit "D"**, granting the following relief:

(a)     Recognizing each of the Debtors' Liquidations as a "foreign main proceeding" and the JLs as the Foreign Representatives of the BVI Companies and the JOLs as the Foreign Representatives of Bridge Global Fund;

(b)     Granting the relief allowable as of right upon recognition of a foreign main proceeding under section 1520 of the Bankruptcy Code;

(c)     Granting the following additional relief under section 1521 of the Bankruptcy Code:

27

(1)      staying the commencement or continuation of any action or proceeding without the consent of the Foreign Representative concerning the rights, obligations or liabilities of the Debtors, the Debtors' estates to the extent not stayed under section 1520(a) of the Bankruptcy Code;

(2)      staying execution against the Debtors to the extent not stayed under § 1520(a);

(3)      suspending the right to transfer or otherwise dispose of any assets of the Debtors to the extent this right has not been suspended under section 1520(a);

(4)      providing for the examination of witnesses, the taking of evidence, and the delivery of information concerning the assets, affairs, rights, obligations or liability of the Debtors and the Debtors' estates under § 1521(a)(4), the Federal Rules of Bankruptcy Procedure, including Fed. R. Bankr. P. 2004, and Local Rule 2004-1;

(5)      entrusting the administration or realization of all of the assets of the Debtors within the territorial jurisdiction of the United States to the Foreign Representatives;

(6)      entrusting the distribution of all or part of the assets of the Debtors located within the United States to the Foreign Representatives;

(7)      granting comity and giving full force and effect to the orders entered by the BVI Court with respect to the BVI Companies and to the orders entered by the Cayman Court with respect to the Bridge Global Fund; and

(d)      granting the Foreign Representatives such other and further relief as this Court may deem just and proper.

28

## BASIS FOR RECOGNITION

93.     The Foreign Representatives have satisfied each of the requirements for recognition set forth in section 1517 of the Bankruptcy Code because (i) the Debtors' liquidations are foreign main proceedings, (ii) the Liquidators filing the Debtors' Petitions and this Motion are foreign representatives under section 101(24), and (iii) the procedural requirements of section 1515 and Bankruptcy Rule 1007 are satisfied.

**A.      The Debtors' Liquidations are Foreign Main Proceedings Under Section 1502**

   ***i.   The Debtors' Liquidations are Foreign Proceedings Under Section 101(23)***

94.     Each of the BVI Companies' liquidations qualifies as a "foreign proceeding" under section 101(23) of the Bankruptcy Code.

95.     The BVI Companies' liquidations are subject to the BVI's Insolvency Act.  As discussed in the Emery Declaration, the Insolvency Act establishes a framework for controlled, court-supervised and collective reorganization and restructuring of obligations of distressed companies. Ex. B, at ¶ 5.  Under the Insolvency Act, a liquidator, whether appointed by members' resolution or by the BVI Court, acts as an officer of the BVI court and as an agent for the company. *Id.* at ¶ 6.  A liquidator has the duties and powers set out in the Insolvency Act and such duties and powers as the BVI Court may order under section 185 and 186 of the Insolvency Act, and may apply to the BVI Court at any time for direction.  *Id.*

96.     The purpose of a liquidation under the Insolvency Act is to realize the assets of the company, declare a dividend for creditors and to return the surplus to the members of the debtor. *Id.* at ¶ 7.  It can be terminated when the liquidators, after completing their duties, prepare a final report together with a statement of realizations and distributions for the creditors and members. *Id.*  Liquidation can also be terminated by the court, on an application by a liquidator, a creditor,

29

director or member, if the court considers it equitable to do so. *Id.* The final step after liquidation is the dissolution of the company, after which the company ceases to exist, and no one can act on behalf of the company. *Id.* The debts and obligations of the company are therefore extinguished. *Id.*

97.    The Cayman liquidation of Bridge Global Fund, subject to The Cayman Companies Act, also qualifies as a "foreign proceeding" under section 101(23) of the Bankruptcy Code. As discussed in the Crane Declaration, The Cayman Companies Act contains similar provisions to the BVI Insolvency Act. *See* Ex. C. The Cayman Companies Act authorizes the liquidators, such as the JOLs, to act jointly and severally and to control the affairs and assets of a company in official liquidation. Upon the appointment of official liquidators to a company, the powers of the directors and members cease, save for very limited circumstances. The official liquidators are officers of the Cayman Court.

98.    Pursuant to section 110 of the Companies Act, the duties of the Joint Official Liquidators are, among other things, (a) to collect, realize and distribute the assets of the company to its creditor and, if there is a surplus, to equity holders, and (b) to report to the company's creditors and contributories (i.e., shareholders) upon the affairs of the company and the manner in which it is being wound up. Ex. C at ¶ 20. In addition, under section 102 of the Companies Act, the Joint Official Liquidators are empowered to investigate, among other things, (i) the causes for the failure of the company, and (ii) generally, the promotion, business, dealings and affairs of the company. *Id.* The Joint Official Liquidators are subject to the supervision and oversight of the Grand Court with respect to the performance of their duties.

99.    Bankruptcy Courts (including this Court) have held that liquidations in the BVI and Cayman constitute "foreign proceedings." *See, e.g.*, *Exential Investments, Inc.*, Case No. 21-

30

15203-RAM, ECF No. 6 (Bankr. S.D. Fla. June 30, 2021) (granting recognition to a BVI liquidation under the Insolvency Act); *In re Olinda Star Ltd.*, 614 B.R. 28, 40-41 (Bankr. S.D.N.Y. 2020) (granting recognition to provisional liquidation in the BVI as foreign proceeding); *In re Fairfield Sentry Ltd.*, 440 B.R. 60, 66 (Bankr. S.D.N.Y. 2010) (same); *In re Performance Ins. Co. SPC*, Case No. 21-12609-AJC, ECF No. 17 (Bankr. S.D. Fla. April 15, 2021) (granting recognition to a Cayman Islands liquidation).

### ii.  The Debtors' Liquidations are "Foreign Main Proceedings" Under Section 1502

100.    The Debtors' Liquidations further qualify as "foreign main proceedings" under section 1502.

101.    First, the Debtors' Liquidations are a foreign proceedings pending in the BVI or in Cayman, where the Debtors' respective registered offices are located. *See* 11 U.S.C. § 1516(c) ("In the absence of evidence to the contrary, the debtor's registered office is presumed to be the center of the debtor's main interests.").

102.    Second, the BVI Companies' only remaining economic activity is centered in the BVI and Bridge Global Fund's only remaining economic activity is centered in the Cayman Islands.

103.    Since their appointment as joint liquidators, the Liquidators engaged in significant tasks in the BVI and in the Cayman Islands in connection to the Debtors' liquidation, such as (i) administration of the Debtors' affairs, business and property, effectively replacing the Debtors' directors; (ii) sending relevant notices to relevant parties in interest; and (iii) providing notice by publication of the Debtors' liquidation, their appointment, and the ability to submit claims in BVI and Cayman Islands newspapers and newspapers of other jurisdictions where potential claimants may receive notice.

31

104.    Moreover, as the BVI Companies are BVI entities in liquidation under the BVI Insolvency Act, and BVI law would likely apply to most disputes arising from the BVI Companies' operations, the BVI is the natural jurisdiction that would be ascertainable by third parties as the Debtors' center of main interests. The same is true of Bridge Global Fund, a Cayman company in liquidation under the Cayman Company Act, and it is likely that Cayman law would apply to most disputes arising from its operations.  Accordingly, the Cayman Islands is the natural jurisdiction that would be ascertainable by third parties as Bridge Global Fund's center of main interests.  *See Servicios de Petroleo Constellation S.A.*, 600 B.R. 237, 272 (Bankr. S.D.N.Y. 2019) (considering the following factors in assessing the debtor's COMI: the location of the debtor's headquarters, of those who manage the debtor, the jurisdiction of whose law would apply to most disputes, and the expectations of third parties as to the debtor's COMI).

## B.    The Liquidators are Foreign Representatives Under Section 101(24)

105.    The Liquidators qualify as "foreign representatives" under section 101(24) of the Bankruptcy Code by virtue of their respective appointments.  As to Brazen Sky, the JLs were appointed as joint liquidators by Brazen Sky's members and directors through qualifying resolutions in accordance with BVI's Insolvency Act.[4]  As to Aabar-BVI, Tanore, Blackstone, Vasco, Selune, Pacific Rim, an Affinity, the JLs were appointed as joint liquidators pursuant to orders of the BVI Court in accordance with the BVI's Insolvency Act.  As to Bridge Global Fund, the JOLs were appointed as joint official liquidators pursuant to an order by the Cayman Court in accordance with the Cayman Companies Act. As Liquidators, the Foreign Representatives have the power to, among other things, (i) administer the Debtors' assets and affairs and run the Debtors'

---

[4]    The resolution also authorizes the JLs to act as the foreign representatives of the Debtors' Liquidations and to commence the Debtors' Chapter 15 cases.

SEQUOR LAW, P.A.

businesses during the course of their Liquidations; (ii) to take possession of, protect and realise the Debtors' assets; and (iii) to distribute the assets or the proceeds of realisation of the assets in accordance with the provisions of the relevant insolvency laws.

**C.    The Debtors' Liquidations Meet the Procedural Requirements of Section 1515**

106.    As stated above, the requirements of section 1515 are satisfied as (i) the qualifying resolutions appointing the JLs and commencing the wind up of the Debtor Brazen Sky is attached to the Barkhouse Declaration as **Composite Exhibit 1**, (ii) the BVI Court's orders placing Aabar-BVI, Tanore, Blackstone, Vasco, Selune, Pacific Rim, and Affinity, into liquidation and appointing the JLs is attached to the Barkhouse Declaration as **Composite Exhibit 1**, and (iii) the Cayman Court's order placing Bridge Global Fund into liquidation is attached to the Barkhouse Declaration as **Composite Exhibit 1**.

107.    Further, the statements required by section 1515(c) of the Bankruptcy Code and Fed. R. Bankr. P. 1007(a)(4) are included in the attached Barkhouse Declaration. Ex. A, at ¶¶ 107-108.

108.    Finally, the Liquidators submit that section 109(a) of the Bankruptcy Code does not apply herein. *See In re Al Zawawi*, 637 B.R. 663, 668 (M.D. Fla. 2022).  To the extent section 109(a) of the Bankruptcy Code applies in Chapter 15 cases, the Debtors qualify as "debtors" under section 109(a) because the Debtors have assets in the United States in the form of monies held on their behalf with Sequor Law.

## CONCLUSION

WHEREFORE, the Trustee respectfully requests that the Court enter an Order, substantially in the form attached as Exhibit D, granting the relief requested herein and such other and further relief as the Court deems just and proper.

33

Dated: August 31, 2022

Respectfully submitted,

SEQUOR LAW, P.A.
1111 Brickell Avenue, Suite 1250
Miami, Florida 33131
Telephone: (305) 372-8282
Facsimile: (305) 372-8202
Email:  ggrossman@sequorlaw.com
          jmendoza@sequorlaw.com
          jmosquera@sequorlaw.com

By:    */s/ Gregory S. Grossman*
        Gregory S. Grossman
        Florida Bar No. 896667
        Juan J. Mendoza
        Florida Bar No.: 113587
        Jennifer Mosquera
        Florida Bar No.: 1018656

34